**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 16-cv-01007

KYLE ASKIN,

Plaintiff,

v.

THE CITY AND COUNTY OF DENVER, a municipality; and
DEPUTY THOMAS FORD, in his individual and official capacities,

Defendants.

_____

**COMPLAINT AND JURY DEMAND**
_____

Plaintiff Kyle Askin, by and through his attorneys Arash Jahanian and Qusair

Mohamedbhai of RATHOD | MOHAMEDBHAI LLC, alleges as follows:

## I.  INTRODUCTION

On July 13, 2014, Denver Sheriff's Deputy Thomas Ford attacked a defenseless

Kyle Askin in the Denver Detention Center.  Video footage showed that Deputy Ford,

aggressively marched toward a seated Mr. Askin and landed a right hook on Mr. Askin's

face as he stood up, knocking him to the ground.  Then, for good measure, Deputy Ford

kicked Mr. Askin while he was on the ground, and with the aid of Deputy William Lewis

dragged Mr. Askin along the ground and forcefully deposited him back on the bench

where he had been seated.  Deputies Ford and Lewis then concocted a story to justify

Deputy Ford's violent outburst and make Mr. Askin look as aggressive and dangerous

as possible so as to cover up Deputy Ford's loss of control.

At the time that the video of Deputy Ford's attack was widely broadcast, the Denver Sheriff's Department was already embroiled in a public crisis that included rampant excessive force and corruption among its deputies and leadership.  Then-Sheriff Gary Wilson declared the incident "a disturbing inappropriate use of force" and resigned from his post in short order.  The various review and reform efforts that followed revealed what already should have been clear: that such an egregious attack was symptomatic of widespread problems, failed policies, and deficient practices throughout the DSD.  These issues included major failures in the investigation of excessive force, policies and training on appropriate force, and supervision and discipline of deputies.  Deputy Ford, supported by other DSD officials, maintained that his assault on Mr. Askin was in conformance with DSD policies and training, and he ultimately suffered only a 40-day suspension for the attack.  Thus, the City and County of Denver shares responsibility with Deputy Ford for the grave violations of Mr. Askin's Eighth and Fourteenth Amendment rights to be free from excessive force.

## II. JURISDICTION AND VENUE

1.      This action arises under the Constitution and laws of the United States and is brought pursuant to 42 U.S.C. § 1983.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331.  Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

2.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  All of the events and omissions alleged herein occurred within the state of

Colorado.  At the time of the events and omissions giving rise to this litigation, all of the parties resided in Colorado.

### III. PARTIES

3.      Plaintiff Kyle Askin is a citizen of the United States of America and a resident of the State of Wyoming.

4.      Defendant City and County of Denver (Denver) is a Colorado municipal corporation.  Denver's Department of Safety is responsible for the oversight, supervision, and training of the Denver Sheriff's Department (DSD).  Denver was at all relevant times the employer of Defendant Deputy Thomas Ford and is a proper entity to be sued under 42 U.S.C. § 1983.

5.      At all times relevant to the subject matter of this litigation, Defendant Deputy Thomas Ford was a citizen of the United States and a resident of Colorado, and was acting under color of state law in his capacity as a law enforcement officer employed by Denver.

### IV.  FACTUAL ALLEGATIONS

#### Deputy Ford Violently Assaulted Mr. Askin

6.      During the night of July 13, 2014, Mr. Askin was undergoing the intake process to be admitted to DSD's Denver Detention Center (DDC).

7.      At approximately 9:56 p.m., Mr. Askin sat down on a bench outside Nursing Station Room B, awaiting an examination by DDC Intake Nurse Chip Edwards.

8.      DSD Deputies Thomas Ford and William Lewis were working in the photo/prints station, near where Mr. Askin was seated.

9.      At 9:59 p.m., Mr. Askin lay down on the bench.

10.     Within the next 10 seconds, Deputy Ford asked Mr. Askin to sit back up, and Mr. Askin immediately complied.

11.     For the next 10 minutes, Deputy Ford engaged Mr. Askin in conversation.

12.     Deputy Lewis also spoke to Mr. Askin at points.

13.     At approximately 10:09 p.m., Deputy Ford made a dismissive hand gesture toward Mr. Askin.

14.     During this conversation, for a total of approximately 10 minutes and 39 seconds, Mr. Askin remained seated on the bench.

15.     Mr. Askin did not demonstrate any behavior to present any concern or threat to Deputy Lewis or Deputy Isabel Rocha, who was in the photo/print station area for part of the conversation between Deputy Ford and Mr. Askin.

16.     At approximately 10:10:37[1] p.m., Deputy Ford turned toward Mr. Askin and walked quickly in Mr. Askin's direction from his position at the print machine.

---

[1] The HH:MM:SS format is used to denote the exact timing of events, down to the second, according to the video.



17.     Mr. Askin remained seated, with his arms at his sides and his legs spread.

18.     Deputy Ford was carrying a bottle of cleaner fluid in one hand and wipes in the other.

19.     According to Deputy Ford's testimony, his last statement to Mr. Askin before assaulting him was "that's it. You're going to a cell."

20.     In response to this command, after Deputy Ford had taken three steps forward, Mr. Askin slowly began to stand up, holding papers in one hand.

21.     Mr. Askin stood straight up with his arms at his sides, in an obedient and passive manner.

22.     Mr. Askin had just been searched and cleared of any possible weapons.

23.     Mr. Askin only had some jail paperwork in his right hand.

24.     Deputy Ford approached Mr. Askin in a quick, hostile, and aggressive manner.

25.     In the video, Deputy Ford appeared to be angry—his mouth was open, his head was moving, and his right arm was moving out and in as he walked toward Mr. Askin.



26.     By the time Deputy Ford was two steps away, Mr. Askin was standing in a shaky but stationary stance, swaying slightly, and flat-footed.

27.     Mr. Askin did not have his arms raised and was not moving toward Deputy Ford or exhibiting any other indicia of a threat to Deputy Ford or anyone else.



28.     Deputy Ford never hesitated or broke stride in his purposeful and aggressive approach.

29.     At approximately 10:10:40-41 p.m., Deputy Ford quickly dropped the items in his hands, got right in front of Mr. Askin, and administered a hard punch to his face with a closed right fist, dropping him to the ground.





30.     Then, at approximately 10:10:42 p.m., Deputy Ford kicked Mr. Askin as Mr. Askin was on the ground.

31.     Deputy Lewis then joined Deputy Ford, and the two deputies dragged Mr. Askin along the ground.

32.     Deputies Ford and Lewis then lifted Mr. Askin and forcefully deposited him on the bench.

33.     Deputies Ford and Lewis escorted Mr. Askin to an isolation cell, with five other DSD officers flanking them.

34.     At approximately 10:12:24 p.m., video evidence shows Deputy Ford making an aggressive and threatening gesture toward Mr. Askin while Mr. Askin is seated in the isolation cell.

35.     Mr. Askin was compliant with DSD officers' orders at all times.

36.     As a result of Deputy Ford's attack, Mr. Askin suffered injuries including a cut bottom lip, bruises on his sternum and chest, and a laceration on his shoulder.

**Deputies Ford and Lewis Filed False Reports about the Assault on Mr. Askin**

37.     Deputy Ford filed his Offense in Custody ("OIC") report during the night of July 13, 2014.

38.     In his report, Deputy Ford stated that Mr. Askin cursed and made threats toward him after Deputy Ford told him he could not lay down on the bench.

39.     According to the report, Deputy Ford "told inmate Askin that if he did not stop with the threats, that he was going to be placed in an isolation cell."

40.     Deputy Ford wrote that he walked toward Mr. Askin to take him to an isolation cell after Mr. Askin said "fuck you, you won't come over here and tell me that shit."

41.     According to Deputy Ford's report, "Inmate Askin then rose up off the bench, and began to approach me in an aggressive manner."

42.     The report continued:  "Due to inmate Askin's behavior, his previous threats, and fearing for my safety, I defended myself with a hand strike to the inmate's face."

43.     Deputy Ford's report stated that Mr. Askin "then stumbled back on to the bench."

44.     Deputy Ford's report made no mention that Mr. Askin fell to the floor, that he kicked Mr. Askin, or that he and Deputy Lewis dragged him along the floor and deposited him on the bench.

45.     Deputy Lewis also filed his OIC report during the night of July 13, 2014.

46.     Deputy Lewis's report stated that he was dealing with an inmate at the photo counter while Mr. Askin made threats, including stating to Mr. Ford, "Bitch and I will kick your ass!"

47.     Deputy Lewis's report continues:

I continued to finish the questions with the inmate that was in front of me at the photo counter.  I then turned to my right and observed Askin stand from the bench and advance toward D/S Ford.  Fearing for officer safety, I instructed the inmate that I was talking to [to] go sit down.  I then quickly proceeded to assist D/S Ford.  While giving verbal commands to Askin to not resist, I gained control of his left arm and placed it in the small of his back.  Askin continued to resist.  We placed Askin on to the bench in a seated position and continued to give verbal commands.

48.     Deputy Lewis's report made no mention of Deputy Ford's punch or kick.

**Deputy Ford Acted Pursuant to DSD Policy and His Training as a DSD Deputy**

49.     Deputy Ford acted pursuant to DSD policy and training at all times in his interactions with Mr. Askin.

50.     Deputy Ford acted pursuant to DSD policy when he approached and struck Mr. Askin.

51.     Deputy Ford acted pursuant to his training as a DSD deputy when he approached and struck Mr. Askin.

52.     Deputy Ford used a strike to the face that DSD officers are taught in the Academy to defend themselves against threats.

53.     Deputy Ford considers his assault of Mr. Askin "a relatively minor use of force."

54.     Deputy Ford testified that his use of force on Mr. Askin was routine and not out of the ordinary for the DSD.

55.     Deputy Ford testified that "there's a lot worse situations that happened in that jail that nothing did—that [ ] is nothing gets, nothing is made of it."

56.     Deputy Ford testified:

Probably from the first week, the first few days at the academy, you are taught that this is a jail environment, that you're not dealing with some of the nicest people in the world.  And, you know, a lot of times force is necessary to maintain control and order in that environment.  So you're taught that very early.

57.     DSD officers are trained in "pre-attack cues," which may include blinking, not blinking, and avoiding eye contact.

58.     DSD Deputy Eishi Yamaguchi, a DSD trainer on use of force tactics, testified at Deputy Ford's appeal hearing before the Civil Service Board on January 29, 2015, that Deputy Ford acted pursuant to DSD policy and training on July 13, 2014.

**Denver Failed to Properly Investigate and Discipline Deputy Ford**

59.     On July 14, 2014, the day after he assaulted Mr. Askin, Deputy Ford was placed on investigatory leave.

60.     Deputy Ford was surprised that he was being placed on administrative leave and had "no clue" why that decision was being made.

61.     On July 15, 2014, Sergeant James Mair of the Denver Police Department's Internal Affairs Bureau (IAB) was assigned with investigating both the criminal and internal administrative charges against Deputy Ford based on his assault of Mr. Askin.

62.     At some point, the jail video of the incident was leaked to a media outlet by an unknown person within DSD, leading to extensive negative television and print publicity against DSD.

63.     On July 16, 2014, DSD Sheriff Gary Wilson wrote an email to all DSD personnel in which he referred to Deputy Ford's "disturbing inappropriate use of force."

64.     That same day, then-Sheriff Wilson issued a media advisory referring to the incident and stating that Deputy Ford had been placed on investigative leave for inappropriate use of force and that Deputy Lewis had been placed on investigative leave for writing an inaccurate report.

65.     On July 17, 2014, DSD issued Deputy Ford a Pre-Disciplinary letter signed by Sheriff Wilson.

66.     On July 21, 2014, Denver announced the resignation of Sheriff Wilson and the appointment of Interim Sheriff Elias Diggins.

67.     At that press conference, Denver Mayor Michael Hancock stated that Deputy Ford's assault of Mr. Askin "took a little more out of my heart and soul."

68.     Mayor Hancock also announced a "major reform effort" including a top-to-bottom review of the DSD, which would include reviewing internal affairs and the administrative policies for disciplining deputies.

69.     On or around July 25, 2014, Sergeant Mair was informed that he was only to handle the criminal investigation for the Denver District Attorney's Office.

70.     DSD never conducted its own investigation of either Deputy Ford or Deputy Lewis.

71.     On August 15, 2014, DSD issued Deputy Ford another Pre-Disciplinary letter, signed by Sheriff Diggins.

72.     On September 5, 2014, following the conclusion of the DPD IAB investigation, DSD terminated Deputy Ford's employment for, among other things, inappropriate force, misleading or inaccurate statements, aggravated conduct prohibited by law (assault in the third degree), and cruel and unusual treatment and abuse of prisoners.

73.     On September 16, 2014, DSD terminated Deputy Lewis's employment for filing a false report with regard to Deputy Ford's use of force.

74.     On January 28, January 29, and February 2, 2015, the Denver Civil Service Board heard the consolidated appeals for the terminations of Deputies Ford and Lewis.

75.     On March 19, 2015, Career Service Hearing Officer Valerie McNaughton issued an order upholding Deputy Ford's termination but reducing Deputy Lewis's discipline to a six-day suspension.

76.     The Hearing Officer held:  "Based on the totality of the circumstances including the rushed pace of Ford's actions, it appears that his decisions were driven by impatience and unwarranted assumptions rather than a reasonable belief that a threat was imminent."

77.     However, the Hearing Officer also held that Deputy Ford "did not kick [Mr. Askin], drag him, or forcefully deposit him on the bench."

78.     The Hearing Officer further held that Deputy Ford did not intend "to punish or abuse [Mr. Askin] by his strike, but that he made a rushed decision to subdue the prisoner by the quickest means that occurred to him at the time."

79.     The Hearing Officer noted that Deputy Ford's "strike to the face of an intoxicated and unarmed inmate . . . . led indirectly to the resignation of the Sheriff and disruption of leadership in the Department."

80.     In an order released on December 17, 2015, the Career Service Board overturned the Hearing Officer's decision to uphold Deputy Ford's termination, and instead reduced the punishment to a 40-day suspension.

81.     The 40-day suspension included a 30-day suspension for all violations concerning use of force and a 10-day suspension for misleading or inaccurate statements.

82.     The Board held that it was appropriately disciplining Deputy Ford "for punching the inmate, and only punching the inmate, based on a mistaken, albeit unreasonable belief that an attack was imminent . . . ."

83.     The Board held that it should issue comparative discipline based on previous incidents in the DSD, and took note of the following incidents:

a.   "Deputy Steven Valerio took a closed fist swing at an inmate, then grabbed the inmate in a headlock, threw him against a wall, and then threw him onto the floor; and then, after handcuffing him, dragged him to his feet by pulling him up by the handcuffs." (footnote omitted).  Deputy Valerio received a 42-day suspension for his attack on the prisoner and was discharged for lying during the investigation.

b.   Sergeant Ned St. Germain received a 10-day suspension for "improperly ordering the use of a Taser against an inmate."

c.   "Deputy Darrell Jordan was issued a ten-day suspension . . . for his use of inappropriate force against a prisoner when he shoved a prisoner three times, causing him to fall against a wall in the process."

d.   Deputy Monwell Fuller received a 10-day suspension after he "chose to confront an inmate by first bumping into him twice, and then choking him while holding him against a wall."

e.  Deputy Brady Lovingier received a 30-day suspension after he "was caught on courtroom camera attacking a prisoner during a court hearing."

f.  Deputy Frank Kemp was discharged after he "poked [an] inmate with his finger several times, pushed the inmate against the wall with his hands at the base of the neck of the inmate for four seconds, and then gave a backhanded slap to the inmate," and for lying to investigators.

84.     The Board further stated that DSD "may very well adopt alternate disciplinary policies for the use of inappropriate force against inmates.  It has not done so.  Rather, using the Disciplinary Matrix and Handbook, the agency is issuing ten[-]day suspensions, thirty[-]day suspensions, forty-two-day suspensions and discharges, all for acts that appear to be of comparable severity."

85.     With respect to the Lovingier incident, the Civil Service Board stated: "This Board was sufficiently shocked at the leniency of the punishment to comment in its decision . . . that if such outrageous conduct warranted only a thirty-day suspension under the Matrix, the Agency might want to consider adjusting the Matrix.  It appears our concerns have gone unheeded and our decision today is, in part, a product of the Agency's inaction."

86.     The Board continued:  "We are not saying that a deputy could not properly be discharged for a single instance of excessive or inappropriate force.  We are saying, however, that based on the matters that have come before us, this is plainly NOT the policy of the Denver Sheriff's Department or the City's Department of Safety."

87.     The Civil Service Board concluded:  "Deputy Ford is ordered reinstated to his position as a Denver Deputy Sheriff and shall be made whole by the Agency for all lost wages and benefits (including those associated with his time in services), save for the forty suspended days."

88.     Immediately following the release of the Civil Service Board's decision on December 17, 2015, Denver Manager of Safety Stephanie O'Malley issued the following statement:

> By frequently reversing sound disciplinary orders issued by my office, the Career Service Board is undermining our authority as an employer and preventing us from appropriately disciplining deputies who have violated department rules and regulations. Based on the facts and evidence, Deputy Ford clearly used inappropriate force during his interaction with the inmate, which is unacceptable to us and to the community. Our view remains that termination is warranted, and after conferring with the City Attorney's Office, we have decided to appeal the Board's decision to the Denver District Court.

89.     In November 2012, then-Denver Manager of Safety Alex Martinez had also publicly criticized the Civil Service process for undermining officer discipline, and called for the reform of the Civil Service Commission.

90.     Following the Civil Service Commission's upholding of the termination of a Denver Police Department officer after many overturned terminations, Manager of Safety Martinez stated:  "That's a positive outcome, but it took a year-and-a-half to get there.  It's a sign of a system that didn't work well. Yeah, it's going to spit out results in our favor sometimes. And so I'm pleased to have the success, but it's merely an illustration for the need for reform."

**Denver Failed to Discipline Deputy Ford
for Previous Similar Assaults on Inmates**

91.     Denver failed to discipline Deputy Ford for excessive force in previous occasions, including a strikingly similar assault of an inmate at the end of 2010 in the DDC that was captured by video camera.

92.     On December 25, 2010, Deputy Ford was working in Pod 4C in the DDC, when inmate Shaun Pack began voicing his displeasure that peanut butter and jelly sandwiches were being served for dinner on Christmas.

93.     Deputy Ford began arguing with Mr. Pack and eventually told him to lock down.

94.     According to Deputy Ford, Mr. Pack refused to lock down.

95.     Deputy Ford got up from behind his desk and charged toward Mr. Pack aggressively.

96.     According to an inmate witness, Deputy Ford told Mr. Pack "I'm going to make your ass go to your room."

97.     Another inmate stated that Deputy Ford then "lost his cool" and told Mr. Pack "if you are going to square off, you are going to lose."

98.     Deputy Ford took two close-fisted swings at Mr. Pack before throwing him to the ground through a metal table and punching him in the face.

99.     Deputy Ford then picked up Mr. Pack and threw him to the ground again and punched him in the face again.

100.     Deputy Ford then dragged Mr. Pack across the ground several feet before throwing him into a closed door.

101.    Deputy Ford then slammed Mr. Pack to the ground again.

102.    Deputy Timothy Knight stated that he was in the corridor when Deputy Ford came out with Mr. Pack and said, "somebody take this guy out of my pod."

103.    As a result of the attack, Mr. Pack chipped his tooth, cut his lower lip, and suffered cuts and abrasions on his hand, side, and knee.

104.    In his Use of Force report, Deputy Ford stated that Mr. Pack took a fighting stance after Deputy Ford approached him.

105.    Deputy Ford then stated in his Use of Force report:  "I raised my hands to defend myself, and then took inmate Pack to the ground."

106.    Deputy Ford made no mention in his Use of Force report of any other time that he took Mr. Pack to the ground, any strikes to Mr. Pack, or dragging Mr. Pack along the floor.

107.    Inmate Pack did not file a grievance and did not know where grievance forms were located, but his father filed a formal complaint.

108.    In its investigation, DSD IAB interviewed only four inmates besides Mr. Pack.

109.    At least a dozen inmates witnessed Deputy Ford's attack on Mr. Pack.

110.    DSD IAB interviewed eight deputies and sergeants besides Deputy Ford, none of whom witnessed the incident but many of whom discussed Mr. Pack's history as an inmate.

111.    DSD IAB exonerated Deputy Ford of any wrongdoing.

112.    In a letter to Mr. Pack's father dated August 24, 2011, DSD IAB wrote:

> Deputy Ford approached your son to escort him back into his holding cell. According to witnesses, your son took a fighting stance and attempted to hit Deputy Ford.  Deputy Ford was placed in a situation by your son where he found it necessary to use force to defend himself and maintain control of the situation.  No policies were violated.  Your son was then quickly removed from the area to prevent further disruption.

113.    Deputy Ford directly referenced the Shaun Pack incident during his testimony at his Civil Service Board appeal hearing to justify his assault and use of force against Mr. Askin.

114.    In another similar incident, DSD Inmate Desmond Jones alleged that on February 8, 2014, Deputy Ford utilized excessive force against him.

115.    Mr. Jones alleged that while he had already been restrained, Deputy Ford was one of several officers who jumped on top of him and slammed him to the floor.

116.    Deputy Ford got on top of Mr. Jones's back and took control of his wrists behind his back, while shouting "stop resisting."

117.    Deputy Ford cut open Mr. Jones's shirt with a cutting tool, causing a three-inch gash.

118.    Deputy Ford was cleared of any wrongdoing with regard to his use of force on Mr. Jones.

### Deputy Ford's Attack on Mr. Askin Was Part of a Pattern of Recent Incidents of Excessive Force by DSD Deputies

119.    Deputy Ford's assault on Mr. Askin was one of many recent incidents of DSD deputy misconduct, including excessive force, to cause public uproar—some of which were noted in the Civil Service Board's decision to reinstate Deputy Ford.

120.    At the July 21, 2014 press conference following Deputy Ford's attack on Mr. Askin, Mayor Hancock stated:  "All of us have been incensed by what we've seen, what we've heard, and what we are investigating.  It's not just one case we've been following up on.  There's been a string of incidents."

121.    On July 1, 2010, Robert Duran filed a lawsuit against the City and County of Denver and Denver Sheriff's Deputy Steven Koehler. Mr. Duran alleged that, while he was waiting unescorted next to an elevator in the Denver County Jail as directed, Deputy Koehler approached him. Without warning or provocation, Deputy Koehler slammed Mr. Duran into the elevator wall. Deputy Koehler then dragged Mr. Duran approximately 10 feet down the hallway. While Mr. Duran was handcuffed, Deputy Koehler kicked him all over his body and face. Mr. Duran was taken to the hospital by ambulance. Mr. Duran's injuries included scalp lacerations, bruised ribs, chest contusions, and a closed head injury. Mr. Duran prevailed in a jury trial.

122.    DSD deputies killed Marvin Booker in the DDC on July 9, 2010.  The excessive force included violently restraining Mr. Booker and wrestling him to the ground, administering a "sleeper" chokehold, and tasing him.  The DSD then engaged in an extensive cover-up of the incident.  Mr. Booker's family prevailed at trial and then reached a $6 million settlement with Denver in November 2014.

123.    In December 2012, a DSD deputy struck an inmate in the face after the inmate pushed a phone towards him on the desk.  The deputy then wrote a misleading and inaccurate report, and lied to criminal investigators that the inmate threw the phone at him.  The incident had been captured by video.  The deputy's termination was upheld

by the Career Service Board in January 2015, but the deputy has appealed to the Denver District Court.

124.    On February 28, 2013, a DSD deputy bumped into an inmate with his shoulder and grabbed the inmate by the neck after the inmate called him names.  The deputy's 10-day suspension has been upheld by the Career Service Board, but he has appealed it to the Denver District Court.

125.    In September 2013, a DSD deputy choked-slammed an inmate against a wall in response to the inmate's comments and the inmate's refusal to follow orders to sit down.  The deputy received a 10-day suspension.

126.    In September 2013, a DSD sergeant ordered deputies to tase an emotionally distraught inmate who had been repeatedly striking his head against the wall.  The inmate was still seated when he was tased.  The sergeant received a 10-day suspension.

127.    On May 7, 2014, three DSD deputies were involved an incident where inmate workers were conducting pat searches and placing physical restraint holds on other inmates.  Two of the deputies made deceptive statements to IAB during the investigation, were terminated, and have appealed.  The third deputy resigned prior to the completion of the investigation.

128.    In June 2014, a DSD deputy responded to a medical emergency in an eight-man cell and used inappropriate force against an inmate.  The deputy resigned before a disciplinary decision was reached.

129.    On December 4, 2014, a DSD sergeant used inappropriate force against an inmate.  The sergeant was already being investigated for harassing a deputy in August 2014, and resigned prior to the completion of either investigation.

130.    In November 2015, Michael Marshall was arrested for trespassing and held at the DDC.  An incident captured on video shows several deputies to pinning him to the ground and holding him there for 13 minutes before placing him in a restraint chair.  At some point during that time, Mr. Marshall suffered a heart attack and choked on his own vomit, causing his heart to stop.  He died at Denver health nine days later. The Denver Office of the Medical Examiner ruled Mr. Marshall's death a homicide, determining that it was "due to being physically restrained by law enforcement during an acute psychotic episode."

131.    In July 2014, Denver paid Jamal Hunter a $3.25 million settlement to resolve a case involving multiple instances of wrongdoing by Denver and DSD deputies. On July 18, 2011, Mr. Hunter was the victim of a fellow inmate's violent attack that was enabled by the complicity of Deputy Gaynel Rumer, who initially received a 40-day suspension.  Part of Deputy Rumer's misconduct included failure to conduct proper rounds.  Then, on July 31, 2011, Mr. Hunter was attacked and choked by Deputy Edward Keller, in an incident that involved Deputy Ford.  This incident was not reviewed despite Mr. Hunter's grievance until after the initiation of his lawsuit.  Deputy Keller's employment was ultimately terminated in September 2014, three years after the incident.  In addition, when additional facts about Deputy Rumer's conduct came to light

during the lawsuit, a second internal affairs investigation involved intimidation of inmate witnesses (who were never interviewed in the first investigation).

132.    As part of the *Hunter* settlement, Denver agreed to conduct an external review of the DSD, which would consider:

  a.  classification of inmates at the DDC for purposes of placement in pods and cells;

  b.  the screening and hiring process for DSD deputies;

  c.  best practices related to the discipline of DSD deputies; and

  d.  best practices related to the functioning of DSD IAB.

133.    The *Hunter* incident and litigation revealed a culture within Denver and the DSD of disregarding inmate welfare and safety.

134.    Among other things, Denver had been on notice of issues concerning rounds conducted by the DSD since the death of Emily Rice in DSD custody in February 2006, yet failed to take appropriate measures to address the deficiencies.

135.    Ms. Rice had received a $7 million settlement, $3 million of which came from Denver.  A training video made by the DSD regarding the Emily Rice case, as part of the settlement agreement, portrayed the DSD deputies who forged round logs as blameless and placed fault for Emily Rice's death on Denver Health staff.

**Deputy Ford's Attack on Mr. Askin Helped Expose Deep-Seated Issues Within DSD, Which Have Been Thoroughly Documented**

136.    The extensive problems leading to violations of inmates' constitutional rights, including Deputy Ford's attack on Mr. Askin, have been thoroughly examined and

documented by various entities, including in relation to the *Hunter* litigation and settlement.

137.    On December 2, 2013, the Denver Office of the Independent Monitor (OIM) issued its 2013 Semiannual Report, which identified serious problems with DSD's investigations of inmate complaints of excessive force, as detailed further below.

138.    In March 2014, then-Sheriff Wilson created four DSD task forces to review policy and procedure, training, staff wellbeing, and discipline.

139.    Then-Sheriff Wilson referenced these taskforces in his media advisory in response to Deputy Ford's assault on Mr. Askin.

140.    On September 10, 2014, Denver Independent Monitor (IM) Nicholas Mitchell authored a letter to Denver Councilman Paul D. Lopez, Chairman of the Safety & Wellbeing Committee, "Re: Critical Issues to be Addressed in the Reform of the Denver Sheriff Department."

141.    The letter discussed a period of "upheaval and transition" for DSD, highlighted by "several videos documenting deputies using extremely troubling inappropriate force against inmates, prompting a public outcry."

142.    The letter also referenced the *Hunter* settlement, Sheriff Wilson's resignation, and the various ongoing reviews of the DSD, and stated:  "These developments have prompted a collective call for answers from the community, faith leaders, City officials, and the DSD staff itself."

143.   IM Mitchell continued:  "I identify several areas of DSD organizational policy and practice that I believe have contributed to the misconduct issues discussed above, and that require particular attention and reform of the DSD."

144.   These areas included "current significant supervisory gaps at the Downtown Detention Center" and "deficiencies in the DSD use of force reports and the use of force database."

145.   The letter continued:  "In this letter, I do not comment in detail on the four areas that will be reviewed by the Independent Consultant as a condition of the settlement agreement between Jamal Hunter and the City and County of Denver: 1) inmate classification, 2) screening and recruitment of deputies, 3) disciplinary best practices, and 4) best practices related to Internal Affairs, although I agree that they merit examination . . . ."

146.   On October 31, 2014, the DSD issued its Phase One Status Report for the DSD Reform Effort, which highlighted the work of the task forces.

147.   On March 19, 2015, the Denver Auditor provided a scathing report on its Performance Audit with regard to DSD Jail Operations, which covered a period spanning January 2003 through January 2015.

148.   "The audit found that the Department of Safety's oversight and DSD's management of jail operations has been poor, harming the City's reputation, increasing risk to sheriff deputies and inmates, and wasting taxpayer resources."

149.   The Auditor further "found that the City's detention facilities—both the Downtown Detention Center and the Denver County Jail—have been consistently

mismanaged.  Both facilities are understaffed due to inaccurate forecasting, leaving DSD supervisors scrambling to fill vacant shifts.  DSD's Internal Affairs Bureau,  which is tasked with investigating allegations of misconduct, has . . . left [us] with a backlog of investigations and un-analyzed data that could have been used to help reduce the very incidents that lead to allegations of misconduct in the first place."

150.    The Auditor also reported:  "I find it troubling that the Department of Safety and DSD have in recent years received in excess of 130 recommendations from other entities tasked with assessing the operations of the Sheriff Department, yet the vast majority of those recommendations have been left unaddressed."

151.    On May 21, 2015, Denver released the results of the independent reviews of the DSD by two firms, Hillard Heintze and OIR Group.

152.    "Hillard Heintze's first and principal finding is that the City and County of Denver need to bring immediate, extensive and sustained reforms to almost every area of the Denver Sheriff Department's operations in order to align DSD with national best practices in corrections, prevent incidents that result in court-ordered fines and penalties, and being to regain public trust.  Critical areas requiring significant changes and improvements include leadership, supervision and strategic planning; . . . use of force; internal affairs; jail management; staffing; [and] training . . . ."

153.    The OIR Group report focused on use of force and internal affairs within the DSD, and provided 57 recommendations for areas of improvement.

154.    Following the release of the independent reports, Mayor Hancock created the DSD Reform Implementation Team, which includes a Use of Force and Internal

Affairs Action Group working to reengineer the DSD's use of force and disciplinary policies.

155.    To fund certain reforms, the Denver City Council approved a 2016 budget that included $24 million dedicated to implementing high-priority recommendations such as hiring more deputies and providing additional use of force training to DSD staff.

156.    On October 15, 2015, Patrick Firman was named as the new Denver Sheriff, after a search conducted by Hillard Heintze.

157.    On January 28, 2016, Sheriff Firman announced that he was following Hillard Heintze's recommendation in reorganizing DSD leadership.

**The DSD Suffered from a Culture of Excessive Force, Which Was Enabled by Inadequate Policies**

158.    The OIR Group report found that "DSD needs to change its culture regarding the use of force by emphasizing its policy, training, and overall Department orientation to the principle that not all legally justifiable force is necessary or appropriate, and that force should be avoided when de-escalation tactics make that possible."

159.    The Hillard Heintze and OIR Group reports further found that "DSD's policies governing the use of force need to be amended to more precisely define important terms, to give greater guidance to deputies regarding the Department's expectations, and to better demonstrate the Department's philosophy and values."

160.    In particular, the OIR Group report recommended:  "In an effort to reduce the need to resort to force, DSD policy should provide additional specific guidance to

deputies and supervisors with regard to dealing with inmates who refuse to follow jail movement orders or come out of their cells."

161.    On March 2, 2016, Sheriff Firman updated the Denver City Council on the status of DSD reforms, including the finalization of a new policy to discourage the use of force by officers.

162.    Sheriff Firman admitted to the City Council that changing the culture around use of force within DSD would be challenging.

### Denver Failed to Adequately Train DSD Deputies on Use of Force

163.    The Hillard Heintze and OIR Group reports stated that "DSD needs to work providing more ongoing, regular training on force tactics and other skills most relevant to deputies in a jail setting . . . ."

164.    The Denver Auditor similarly "found that the training provided to sheriff deputies is not targeted to their work assignments and daily challenges."

165.    Specifically, the Hillard Heintze and OIR Group reports noted that "[i]n general, DSD does not conduct training in areas that could lower the risk or frequency in use of force events.  These include, for example, placing a greater emphasis on interpersonal communications skills and de-escalation techniques, understanding how and when to use less-lethal weapons, and crisis intervention."

### Denver Failed to Supervise DSD Deputies and Properly Staff the DDC

166.    During Deputy Ford's tenure at DSD, including at the time of his assault on Mr. Askin, the supervision of DSD deputies has suffered from severe deficiencies.

167.   On August 21, 2014, the DSD Training Task Force released its recommendations, which included:  "Add more sergeants to improve the span of control and improve supervision of deputies while on duty."

168.   The recommendations referenced the following shortcoming within DSD: "Current span of control exceeds best practice of one supervisor for every 3-7 subordinates.  **Current ratio is 1:9.24**" (emphasis in original).

169.   In his September 10, 2014 letter to Councilman Lopez, IM Mitchell detailed "Supervisory Gaps at the Downtown Detention Center."

170.   IM Mitchell noted that "[f]requent supervision is . . . critical to deterring deputy misconduct, and identifying problematic deputy behavior before it escalates into serious impropriety."

171.   IM Mitchell then stated that "many DDC sergeants spend the bulk of their shifts completing paperwork and managing each jail floor's staffing roster, instead of supervising deputies."

172.   Sergeant James Szumowski, who supervised Deputies Ford and Lewis during the assault on Mr. Askin, testified during their Civil Service hearing that he agreed that DSD sergeants should be spending more time supervising deputies rather than completing paperwork and managing staff rosters.

173.   Sergeant Szumowski elaborated:  "Just there's not enough supervision to go around.  They're supposed to be one on each floor, but sometimes there's three of us in the whole jail."

174.   Sergeant Szumowski testified that in this respect "[t]he whole facility is hurting, from the intake to the 5th floor . . . ."

175.   IM Mitchell's letter continued:  "DDC deputies with whom we spoke corroborated that supervision is often absent in the DDC . . . ."

176.   Deputy Ford testified, both during the internal affairs investigation and at his Civil Service hearing, that the DDC is short-staffed and supervisors are busy, so the common practice was for deputies to approach and address unruly inmates alone.

177.   Similarly, the Hillard Heintze report noted:  "Many deputies indicated that they did not have regular contact with their supervisors during their shifts . . . ."

178.   The report recommended that "DSD supervisors, in general, need to place a much higher priority on supervising employees and holding them accountable for their duties."

179.   In his letter, IM Mitchell concluded:  "These supervisory gaps at the DDC, and the perception by deputies that they are not being supervised, reducing mentoring of deputies, diminish opportunities for the early identification of deputy performance problems, and create conditions that could foster misconduct."

180.   He recommended, among other things, "that the DSD review and enhance the training provided to new sergeants to ensure that it thoroughly prepares them to supervise deputies, and make available additional resources that will enable sergeants to be more effective at providing supervision . . . ."

181.   The DSD's October 31, 2014 Phase One Status Report for the DSD Reform Effort confirmed the findings of the Training Task Force and OIM:

As inmate populations have trended higher, the Department has experienced staffing shortages. Deputies work long hours — as many as 16 hours at a time — and are supervising up to 64 inmates . . . . Deputies often work alone at their posts. Their supervisors, Sergeants, are often required to spend much of their time conducting administrative work due to understaffing. The Department also is working to address a shortage of sergeants. Best practice is for each sergeant to supervise three to seven deputies and the current ratio is 1:9.

182.    In its March 2015 report, the Auditor also noted DSD's significant problem

of overworking deputies and understaffing its jails:

A 2014 assessment conducted by the City's Office of Human Resources (OHR) found that the average DSD employee worked approximately twenty-four hours of mandatory overtime each week. According to the OHR report, when deputy sheriffs are required to work overtime after completing a twelve-hour shift, the effects of individual stress and fatigue may lead to "inappropriate behavior, bad decisions, and wrong choices on and off the job, resulting in potential disciplinary problems."

183.    The Auditor further found that a flawed staffing methodology resulted in

consistent understaffing within DSD.

184.    The DSD Training Task Force's recommendations included changing

shifts from 12 hours to 10 hours, changing the employee break structure, and training

deputies on anger/stress management.

185.    On July 13, 2014, Deputy Ford was working a 12-hour shift that went from

2:30 p.m. to 2:30 a.m.

186.    As Deputies Ford and Lewis conversed with each other leading up to the

assault on Mr. Askin, they talked about how tired Deputy Ford was and made comments

such as "Stay awake.  We've got a couple hours to go."

**DSD Has Rubber-Stamped Officers' Use of Force and Often Not Even Referred Cases to Internal Affairs**

187.   In his September 10, 2014 letter to Councilman Lopez, IM Mitchell opined "that the DSD framework for reporting and tracking uses of force has significant flaws that compromise the investigation and review of uses of force in Denver's jails at present."

188.   The OIR Group report similarly found "significant shortcomings in the way the Sheriff Department investigates and reviews most force incidents."

189.   Among the flaws that IM Mitchell detailed were lack of necessary detail in use of force reports and DSD policy's allowance of sergeants to make determinations about the propriety of use of force by merely reviewing reports without any other forms of evidence.

190.   The OIR Group report provided more detail in its assessment:

Basic steps such as obtaining an account from the inmate upon whom force was used, interviewing any witness inmates, and reviewing video evidence of the force incidents are neither required nor expected of the first-level supervisor entrusted to review the incident.   As a result, in Denver's jails, most force "investigations" primarily consists of the sergeant reading deputy accounts and then signing off on the force as justified.

For most force incidents, there is also no meaningful holistic assessment through the prisms of training, briefing, supervision, and equipment. . . . At DSD, this type of comprehensive evaluation was almost never done. Instead, use of force reports were simply collected, checked off as in-policy, and filed away.  To date, this wholly inadequate force investigation and review protocol is standard business in the Denver jails.

191.    The report noted that "[s]uch a factual review is woefully deficient and fails to meet law enforcement industry standards for any investigation, let alone one in which a deputy has invoked his or her authority to use force."

192.    The Auditor similarly found in its March 2015 report that DSD "has not performed trend or root-cause analysis related to use of force incidents.  DSD Command acknowledged that data integrity issues exist with use of force data within [the Jail Management System]."

193.    The OIR Group report found that these shortcomings in the DSD's review of force incidents have devastating consequences:

> Consequently, the review of any force incident that is not referred to Internal Affairs for a formal investigation has little chance for a meaningful review in the Denver Sheriff Department.  Unless an inmate complains or the event otherwise finds its way to Internal Affairs, there is virtually no likelihood that the force will be carefully and holistically reviewed for purposes of personal accountability, training or tactical issues, equipment issues, or issues of supervision.  Accordingly, the Department loses countless opportunities to monitor and correct behavior in this critical area.

194.    Another problem identified in the report was the following:  "It is widely-recognized that jail grievance policies should be structured to be accessible to all inmates, yet current DSD policies and practices may inadvertently limit inmate access to the grievance process."

195.    These issues within DSD's review of force were particularly problematic because in its 2013 Semiannual Report, OIM revealed that DSD was not referring investigations to IAB as required.

196.    Out of 54 complaints of serious deputy misconduct between January 1,

2011 and June 30, 2013, including 31 allegations of inappropriate force, 45 did not

result in IAB cases.

197.    As the OIM noted, "[t]his deviates from both DSD policy and national

standards on law enforcement accountability."

198.    A policy memo issued by a former Division Chief of the Downtown Division

had instructed DDC employees not to relay allegations without command permission.

199.    The OIR Group report noted:  "This was a serious failing that deserved the

negative attention it received."

200.    In addition, DSD only notified the OIM of 10 out of 54 allegations of deputy

misconduct contained in inmate grievances, in violation of Denver City Ordinance.

201.    The OIM report stated that it was "thus unable to satisfy [its] mandate by

recommending the investigation of the remaining complaints, examining them for trend

information about officer conduct, or otherwise ensuring that they were handled

according to DSD policy and national standards."

**DSD IAB's Delays and Backlog Prevented Denver from Adequately Investigating
Excessive Force**

202.    In his September 10, 2014 letter to Councilman Lopez, IM Mitchell stated

with regard to Internal Affairs investigations:

> For several years, the OIM has registered its concern that it has taken too
> long for investigations into alleged deputy misconduct to be completed.
> As has recently been reported in the print media, the caseload and
> backlog in DSD Internal Affairs is growing, which is cause for additional
> concern.   The lengthy timeline for investigating and resolving jail
> misconduct complaints at present is unacceptable for accused deputies,

for the public, and for the investigators in DSD Internal Affairs who are working hard under challenging conditions.

203.    In its 2012 Annual Report, OIM had noted that increasing delays in completing internal affairs investigations "may prevent [the] department from acting quickly to correct or deter deputy misconduct, may lower morale, and tend[] to undermine public and department trust in the complaint process."

204.    On October 2, 2014, the DSD Discipline Task Force, which included Interim Sheriff Diggins, former Sheriff Wilson, and former Manager of Safety Al LaCabe, issued 32 recommendations, one of which identified "a need to increase the quality and speed of the DSD Internal Affairs process, giving priority to those cases in which inappropriate force, other inmate treatment issues, or deceptive conduct is alleged."

205.    In the fall of 2014, the DSD attempted to address the backlog of cases and increase the efficiency of IAB case by hiring retired Arapahoe County Sheriff Grayson Robinson to lead its IAB on an interim basis, in addition to six on-call investigators.

206.    The DSD also announced that it had created a new office, the Conduct Review Office, to increase the efficiency of reviewing discipline cases and to shorten the disciplinary process overall.

207.    In its 2014 Annual Report released on March 11, 2015, the OIM noted a 45% increase in the total number of complaints recorded against DSD sworn personnel from 2013 to 2014, 16% of which were complaints of excessive force.

208.    The report observed that the complaint handling process slowed down in 2014 compared to 2013.

209.    The OIG Group report noted that as DSD "sought to handle the 45 old grievances that had not been properly investigated or reviewed, the caseload at IA grew, contributing to an already existing backlog of overdue cases that was the result of years of inadequate resources, internal leadership failures, and the lack of an effective system for monitoring investigations."

210.    The OIG Group report noted that "unlike many jurisdictions, Denver does not have a statute setting a limitations period on disciplinary actions against peace officers.  As a result, there is no external deadline on when an investigation must be completed or discipline imposed."

211.    The OIR Group anecdotally "heard about cases languishing months and years with no work being done toward completion as investigators got overburdened and fell behind on their cases."

212.    For example, "[i]n 2014, Internal Affairs discovered over 100 informal complaints that had been languishing at the division level well past the 180-day deadline set by Department policy, and then learned that these investigations had been incorrectly assigned, so that some did not even know they were supposed to be working on them and they were essentially lost in the system."

213.    The OIR Group report concluded:

These sorts of delays undermine the purpose of a disciplinary system – to maintain the integrity of the agency while holding people accountable for their actions   They likewise erode the public's trust in the Department's ability to police itself and weaken deputies' confidence in their leaders. When an agency imposes discipline years after an incident, it leaves one to question how seriously the agency takes the misconduct and diminishes the important of the disciplinary action, in that the lessons that should be learned from the incident have long since faded in memories.

214.    In its 2016 Annual Report released on March 16, 2016, which mentions Deputy Ford's assault on Mr. Askin, the OIM noted a 45% decrease in total complaints against DSD deputies from 2014.

215.    The report stated that OIM would be monitoring the trend in the future.

216.    The OIM further reported:  "There has been considerable turnover in the command staff of IAB in the past two years, which, we believe, has had a significant impact on the work of the unit."

217.    The OIM then noted that "[t]o ensure that potentially serious complaints were being properly handled," beginning in June 2015 it had repeatedly requested copies of inmate complaints that required formal investigations, "presumably due to their level of seriousness," but that it had not received the complaints.

218.    The OIM was "thus unable to ascertain the seriousness of these complaints, whether they had been properly handled, or whether it was appropriate that many of them were not, apparently, being recorded within [the DSD's complaint tracking database] or investigated by IAB."

**DSD's Disciplinary Policies and Matrix Undermine Discipline for Excessive Force**

219.  As demonstrated by the Denver Civil Service Board's decision to reduce Deputy Ford's termination to a 40-day suspension, DSD's disciplinary policies and matrix prevent effective discipline for excessive force.

220.  In his September 10, 2014 letter to Councilman Lopez, IM Mitchell stated with respect to DSD discipline:

[B]ecause providing a safe and secure environment for inmates is part of the core mission of the DSD, disciplinary penalties for inappropriate force must be strong enough to deter potential misconduct, while also being fair to deputies.   I believe that the DSD Disciplinary Matrix provisions on inappropriate force need to be restructured to ensure that they achieve both goals.

221.   On October 2, 2014, the DSD Discipline Task Force issued 32 recommendations, which included altering several DSD rules and regulations to increase the level of discipline for certain violations involving use of force and abuse of prisoners.

222.   Another recommendation was for "a comprehensive review of DSD's use of force policies, the DSD Discipline Handbook and discipline matrix, and use of force training to ensure compliance with" state law governing use of force policies.

### V. STATEMENT OF CLAIMS FOR RELIEF

### <u>FIRST CLAIM FOR RELIEF</u>
### 42 U.S.C. § 1983 – Fourteenth Amendment
### Excessive Force / Violation of Due Process
### (Against All Defendants)

223.   Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

224.   At all times relevant to this claim, Deputy Ford was acting under color of state law in his capacity as a Denver Sheriff's Department Deputy.

225.   Plaintiff had a clearly established constitutional right under the Fourteenth Amendment to the United States Constitution to be free from excessive force that amounts to punishment and a violation of his due process.

226.    Any reasonable law enforcement officer knew or should have known of this clearly established right.

227.    Deputy Ford nonetheless violated Plaintiff's clearly established constitutional right under the Fourteenth Amendment to the United States Constitution to be free from excessive force that amounts to punishment and a violation of his due process.

228.    Deputy Ford's actions were not rationally related to any legitimate nonpunitive governmental purpose.

229.    Deputy Ford engaged in use of force that was disproportionate to the need presented.

230.    Deputy Ford inflicted significant physical injuries on Plaintiff through his excessive force.

231.    Deputy Ford's force was inspired by malice and unwise, excessive zeal amounting to an abuse of official power that shocks the conscience.

232.    Deputy Ford's actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's federally protected rights.

233.    Deputy Ford engaged in these acts and omissions pursuant to the custom, policy, and practice of Denver, which encourages, condones, tolerates, and ratifies the use of excessive force and deprivation of constitutionally protected interests by law enforcement officers.

234.    The acts or omissions of each Defendant, including the unconstitutional policy, procedure, custom, and/or practice described herein, were the legal and proximate cause of Plaintiff's damages.

235.    As a direct result of Deputy Ford's unlawful actions as described above, Plaintiff suffered actual physical, emotional, and economic injuries in an amount to be proven at trial.

236.    Plaintiff has been and continues to be damaged by Deputy Ford's use of excessive force.

<u>SECOND CLAIM FOR RELIEF</u>
**42 U.S.C. § 1983 – Eighth and Fourteenth Amendments**
**Excessive Force / Cruel and Unusual Punishment**
**(Against All Defendants)**

237.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

238.    Plaintiff had a constitutionally protected and clearly established right to be free from excessive force amounting to cruel and unusual punishment.

239.    Deputy Ford unlawfully inflicted unnecessary and wanton pain on Plaintiff by means of excessive physical force and thereby committed cruel and unusual punishment against him.

240.    Deputy Ford's actions, as described above, were objectively unreasonable in light of the facts and circumstances confronting them.

241.    Deputy Ford's actions, as described above, were undertaken maliciously and sadistically to cause harm rather than in a good-faith effort to maintain or restore discipline.

242.    Deputy Ford's actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's federally protected rights.

243.    Deputy Ford engaged in these acts and omissions pursuant to the custom, policy, and practice of Denver, which encourages, condones, tolerates, and ratifies the use of excessive force and deprivation of constitutionally protected interests by law enforcement officers.

244.    The acts or omissions of each Defendant, including the unconstitutional policy, procedure, custom, and/or practice described herein, were the legal and proximate cause of Plaintiff's damages.

245.    As a direct result of Deputy Ford's unlawful actions as described above, Plaintiff suffered actual physical, emotional, and economic injuries in an amount to be proven at trial.

246.    Plaintiff has been and continues to be damaged by Deputy Ford's use of excessive force.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Unconstitutional Customs, Policies, and Practices
### (Against Defendant City and County of Denver)

247.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

248.    Denver failed to properly train, supervise, and discipline its employees, including Deputy Ford, with respect to the use of excessive force and inmates' due process rights.

249.    Denver's failure to, in its supervisory duties, adequately train, supervise, discipline, and investigate its officers with respect to the use of excessive force and inmates' due process rights is a custom, policy, or practice of Denver and a driving force behind the constitutional violations described herein.

250.    Denver has a culture of tolerating excessive force and violation of due process by its law enforcement officers.  Denver failed to discipline, train, and supervise Deputy Ford concerning the Eighth and Fourteenth Amendments, the use of excessive force against persons in his custody, and those persons' due process rights.

251.    Despite being put on notice of Deputy Ford's misconduct towards inmates including excessive force, Denver maintained Deputy Ford as an active member of the DSD.

252.    The constitutional violations against and harming of Plaintiff was a foreseeable consequence of Denver's actions and inactions.

253.    Denver was deliberately indifferent to the constitutional rights of its citizens, knowing that Deputy Ford presented a danger to them, by failing to properly train, monitor, supervise, and discipline its employees with respect to the use of excessive force and due process.  Denver could have and should have pursued reasonable methods of training, monitoring, supervising, and disciplining its employees.

254.    Denver's policies, customs, or practices in failing to properly monitor, train, supervise and discipline its employees were the moving force and proximate cause of the violation of Plaintiff's constitutional rights.

255.    The acts or omissions of Denver caused Plaintiff damages in that he suffered extreme physical and mental pain during and after the assault.

256.    The actions or omissions of Denver as described herein deprived Plaintiff of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused him other damages.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against each of the Defendants, and award him all relief allowed by law, including but not limited to the following:

(a)    All appropriate relief at law and equity;

(b)    Declaratory relief and other appropriate equitable relief;

(c)    Economic losses on all claims as allowed by law;

(d)    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(e)    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(f)    Attorneys' fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

(g)    Pre- and post-judgment interest at the appropriate lawful rate; and

(h)    Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 3rd day of May 2016.

*s/Arash Jahanian*
Arash Jahanian
Qusair Mohamedbhai
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
(303) 578-4400 (p)
(303) 578-4401 (f)
aj@rmlawyers.com
qm@rmlawyers.com

*Attorneys for Plaintiff*